The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chrystal Redding Stanback and the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the holding of the Deputy Commissioner. However, pursuant to its authority under G.S. § 97-85, the Full Commission has modified the Deputy Commissioner's decision and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 8 May 1998 as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and that the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. At all times relevant to this claim, an employer-employee relationship existed between the deceased employee, Walter Wayne Dillard, and defendant-employer.
3. At all times relevant to this claim, defendant-employer regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act.
3. Safeco Insurance Companies is the carrier on risk for the employer.
4. The following is a list of all exhibits stipulated into evidence:
 a. Stipulated Exhibit (1)-decedent's medical records (25 pages);
 b. Stipulated Exhibit (2)-decedent's death certificate;
 c. Stipulated Exhibit (3)-decedent's W2 statements for 1994 through 1996 (3 pages);
 d. Stipulated Exhibit (4)-funeral expenses for decedent (3 pages).
 * * * * * * * * * * * RULINGS ON EVIDENTIARY MATTERS
The objections raised during the depositions of Dr. Mark and Dr. Frid are ruled upon in accordance with the law and consistent with the findings and conclusions of law within this Opinion and Award.
 * * * * * * * * * * *
Based upon the entire record of evidence, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of his death on 4 April 1996, Mr. Walter Wayne Dillard, hereinafter decedent, was fifty years old. At that time, decedent was employed by defendant-employer as the manager of its store in Greensboro, North Carolina.
2. Plaintiff in this matter, Linda S. Dillard, is the widow of the decedent. Plaintiff and decedent were married in 1979, and were continuously married until decedent's death on 4 April 1996. No children were born of this marriage. Decedent had two sons from a prior marriage, one of whom pre-deceased him. The remaining son was neither wholly nor partially dependent upon the earnings of the decedent for support at the time of the decedent's death.
3. After graduating from high school, decedent received a two year certificate in Business Administration. The majority of his work history was in the automotive repair industry, including positions as a transmission specialist, a store manager and district manager. Decedent also was the owner and founder of his own automotive business in Houston, Texas for five and a half years. In December 1990, decedent was hired as a branch manager by defendant-employer and was promoted to the position of store manager within four months.
4. Decedent managed the defendant-employer's store in Hampton, Virginia, and during his tenure there, the store's sales increased tremendously. At this store, decedent had an adequate number of mechanics, an effective assistant manager and enjoyed his work.
5. In 1993 or 1994, decedent was transferred to the Greensboro, North Carolina store on Cone Boulevard as the store manager. Plaintiff drove decedent to and from work each day. Decedent arrived at work around 6:45 a.m. and would stay until around 7:00 p.m.
6. Prior to decedent's death, plaintiff observed that the he was experiencing stress due to unusual conditions and stress at work. Unlike defendant-employer's store in Virginia, decedent's store in Greensboro had a shortage of mechanics. Despite decedent's requests to management for replacement mechanics for the two who had left his store, this shortage was never remedied. As a result, in addition to his managerial duties, decedent was often required to work on cars. Also different at the Greensboro store was the lack of a helpful assistant manager. This resulted in decedent having to assume a number of the duties normally assigned to the assistant manager. Additionally, decedent assisted the district manager with paperwork, trained other assistant managers in the district and handled troubleshooting for other stores.
7. Mr. Robert Loer, defendant-employer's Regional Manager, admitted that decedent had complained to him about having a shortage of mechanics and about having an ineffective assistant manager.
8. Although the management duties at each of defendant-employer's stores were supposed to be the same, the conditions at each store were not. Consequently, because of the unusual and stressful conditions at the Greensboro store, the amount and type decedent's managerial duties were different than those at other stores.
9. During this period of unusually stressful conditions at decedent's work, plaintiff came by the store at lunchtime to bring decedent's lunch. Plaintiff observed that only decedent and one other worker were present, although the phones were ringing, the shop was full of customers, there were a number of cars waiting to be serviced. On that date, decedent was so busy that he did not have time to eat lunch.
10. Plaintiff's testimony concerning her husband's excessive and stressful work environment and the shortage of help was corroborated by several other witnesses and is found by the Full Commission to be credible.
11. At the time of the hearing, Mr. Bernard Westbrook was the University Courier and Assistant Vehicle Coordinator at North Carolina A T State University. He is also a trainer facilitator and teaches courses in stress management and workplace safety. When Mr. Westbrook took his vehicles to be serviced at the Cone Boulevard store, he observed that decedent lacked the necessary help and that decedent was overworked. Often Mr. Westbrook had to wait for long periods of time because the store did not have enough employees for the amount of work to be done. Mr. Westbrook also observed decedent performing numerous jobs, including answering phones, waiting on customers and working on cars in the bay. At some point, due to the shortage of help, decedent sought help from Mr. Westbrook in trying to recruit mechanics and a secretary.
12. Mr. Westbrook was an uninterested witness and his testimony is found by the Full Commission to be probative and credible.
13. Mr. Brian Graves, a former employee of defendant-employer, worked under decedent at the Cone Boulevard store. Mr. Graves described the work environment as hectic and stressful. After his first eight or nine months of employment, the store lost two mechanics and this shortage was never remedied by the company. Mr. Graves recalled occasions when the only employees at the store would be decedent, a tire changer and himself.
14. Mr. Michael McCoy worked at the Cone Boulevard store from August 1995 to May 1996 and also found the working conditions at this store to be stressful. Mr. McCoy established that the shortage of mechanics caused a back up in the flow of work and that the store had such a large volume that he regularly was unable to take his lunch hour. Because of the volume of work and shortage of help, Mr. McCoy was required to work up to sixty hours per week.
15. The Full Commission finds the testimony of Mr. McCoy regarding the working conditions in decedent's store during the time period before his death to be credible.
16. An additional and unusual stressful factor of decedent's work with defendant-employer was his perception of discriminatory treatment by his employer. Decedent, an African-American, had an outstanding work record. Decedent's outstanding work record is documented by his receipt of numerous awards, such as President's Club, Store of the Quarter and Store of the Year. Nonetheless, persons who had been with the company for less time than decedent had been promoted over him. In particular, a Caucasian employee that had been supervised and demoted by decedent was promoted to the position of Group Manager. Plaintiff testified that situation further upset decedent regarding his work.
17. Mr. Westbrook saw decedent a day or two before his death. Decedent expressed to Mr. Westbrook that he was overworked and stressed. Mr. Westbrook noticed that decedent had started smoking again, that he was exhausted and irritable.
18. On the last day that decedent worked for defendant-employer, plaintiff came by the store to pick him up. At that time, the store hours had been extended to 8:00 p.m. While there, plaintiff heard her husband make a sighing, moaning noise that she had never heard before. At approximately 9:00 p.m., plaintiff insisted that they go home. On the way home, plaintiff and decedent stopped for gas, but decedent was too tired to pump the gas. Upon arriving home, decedent ate dinner and went to bed. At approximately 11:30 p.m., plaintiff again heard decedent making sighing and moaning sounds. Plaintiff called the paramedics, who transported decedent to the hospital, where he died shortly thereafter from cardiac arrest.
19. Defendants offered the testimony of Dr. Daniel B. Mark, a cardiologist and professor of medicine at Duke University. Dr. Mark is board certified in internal and cardiovascular diseases. One-third of his practice is clinical, while two-thirds of his time is spent in research. Dr. Mark has conducted a study the results of which concluded that there is no relation to high job strain and coronary artery disease.
20. According to Dr. Mark's assessment, decedent had almost all of the cardiac risk factors for coronary artery disease, including diabetes, hypertension, smoking, and hypercholesterolemia. After reviewing the transcript of hearing and decedent's medical records, Dr. Mark was unable to identify a "trigger" for his cardiac event. However, Dr. Mark also admitted that a series of acute work related events could trigger a fatal heart attack. The key, according to Dr. Mark is how an individual interprets these events. This correlation by Dr. Mark between psychological issues and the development of coronary problems is documented in an article he authored entitled "Job Strain and the Prevalence and Outcome of Coronary Artery Disease." In that article, Dr. Mark wrote, "Mental Stress also has been shown to trigger myocardial ischemia and cardiac arrhythmias. The psychological responses to psycho-stressors, including work-related stressors, may indeed affect the development of coronary disease, the precipitation of acute events, or both."
21. A premise for Dr. Mark's opinions was that decedent had coronary artery disease and that his heart attack resulted from that condition. However, decedent's medical records establish that no such diagnosis had ever been made. When decedent was admitted to Houston Northwest Medical Center on 31 March 1990 with complaints concerning his throat, the cardiac test conducted showed a regular sinus rhythm and did not reveal coronary artery disease. When Dr. Jerome O. Spruill, a cardiologist, examined Mr. Dillard on 6 January 1996, decedent's sinus rhythm was normal and decedent was not diagnosed with coronary artery disease.
22. Plaintiff presented medical expert testimony from Dr. David Joshua Frid, a cardiologist employed by the Ohio State University Medical Center in Columbus, Ohio as its Director of Preventative and Rehabilitative Cardiology. Dr. Frid's responsibilities include patient care, medical research, and administrative responsibilities. Dr. Frid is board certified in both internal medicine and in the subspecialty of cardiovascular diseases.
23. Dr. Frid testified that based on medical research over the last twenty years, the majority of cardiologists and physicians in the United States accept the proposition that there is a strong association between psychological factors, stress and heart disease. Dr. Frid also noted that the medical literature over the past ten to fifteen years has established that stressful events and conditions impact upon the development of cardiac disease, and specifically on sudden death and cardiac arrest. In addition, studies have shown that people put in stressful situations can develop ischemia or decreased blood flow.
24. Dr. Frid further explained that there is a difference between a "trigger" and a "risk factor" as it relates to heart disease and cardiac arrest. Studies done in the 1980's showed that "triggers" or stressful events cause plaque in the blood vessel to rupture. The ruptured plaque can cause a blood clot, resulting in a heart attack and sudden death.
25. Dr. Frid opined that there is a high probability of a direct relationship between decedent's stressful work environment, his cardiac arrest and ensuing death. Dr. Frid further opined that any one of plaintiff's job-related stressors could have been a trigger and contributing factor to his heart attack.
26. Dr. Frid devotes a considerable amount of his time to the treatment and care of cardiac patients and has treated many patients suffering from job-related stress. Dr. Mark conceded that only a small amount of his time is devoted to patient care in the clinical setting. In fact, he admitted that he has never seen a patient who came to him complaining of job stress.
27. During his deposition testimony Dr. Mark was not familiar with some of the major medical studies in the area of job stress and cardiac arrest, including the most recent major study in this area done by Drs. Peter Schnall and Thomas Pickering. That study showed a direct causal link between job strain and increased ambulatory blood pressure and was published in PsychosomaticMedicine on 24 November 1998. A study done by Dr. Dominquez McNeilly, of Duke University, showed a direct causal link between racism and negative effects on the heart in African-Americans, however, Dr. Mark testified that he was not aware of the results of these studies. Thus, plaintiff's exhibits #2-6 tendered during Dr. Mark's deposition, are admitted into evidence for the purpose of impeaching Dr. Mark's credibility with respect to his knowledge of the studies done in this area of cardiology. There was no objection to plaintiff's exhibit #1.
28. The Full Commission places greater weight on the opinions of Dr. Frid as opposed to the opinions of Dr. Mark with respect to the cause of decedent's cardiac arrest and death on 4 April 1996.
29. Unusual and increased work related stress preceding his heart attack constituted an interruption of decedent's normal work routine. This work related stress was a trigger for and set in motion a chain of events which proximately resulted in decedent's cardiac arrest and death on 4 April 1996.
30. On 4 April 1996, decedent sustained an injury by accident arising out of and in the course of his employment with defendant-employer when he experienced an acute cardiac incident as the result of unusual levels of work related stress. This injury by accident resulted in decedent's death on this date.
31. Decedent's average weekly wage on 4 April 1996 was sufficient to yield the maximum compensation rate for 1996 of $492.00 per week.
 * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Decedent's average weekly wage on 4 April 1996 was sufficient to yield the maximum compensation rate for 1996 of $492.00 per week. G.S. § 97-25.
2. On 4 April 1996, decedent sustained an injury by accident arising out of and in the course of his employment with defendant-employer when he experienced an acute cardiac incident as the result of unusual levels of work related stress, which ultimately resulted in his death on that date. G.S. §97-2(6).
3. Plaintiff in this matter, Mrs. Linda S. Dillard, is the widow of decedent and is conclusively presumed have been wholly dependent upon him for support. G.S. § 97-39.
4. As the sole person wholly dependent upon decedent for support, plaintiff is entitled to benefits at the $492.00 per week for 400 weeks, payable in one lump sum. G.S. §97-2(15); G.S. § 97-38.
5. Defendants are liable for payment of all medical expenses incurred as a result of decedent's injury by accident, cardiac arrest an death on 4 April 1996. G.S. § 97-25.
6. Plaintiff is entitled to payment of burial expenses not to exceed $2,000.00 as a result of decedent's injury by accident, cardiac arrest an death on 4 April 1996.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the Deputy Commissioner's holding and enters the following:
 AWARD
1. Subject to the attorney's fee approved herein, defendants shall pay plaintiff, Mrs. Linda S. Dillard, the amount of $196,800.00, which represents 400 weeks of death benefits compensation at the rate of $492.00 per week.
2. Defendants shall pay all medical expenses incurred as a result of decedent's injury by accident, cardiac arrest an death on 4 April 1996.
3. Defendants shall pay plaintiff, Mrs. Linda S. Dillard, burial expenses not to exceed $2,000.00 as a result of decedent's injury by accident, cardiac arrest an death on 4 April 1996.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded above is approved for counsel for plaintiff. This fee shall deducted from compensation due plaintiff and paid directly to counsel for plaintiff.
5. Defendants shall pay the costs.
 S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ _____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
S/ _____________ DIANNE C. SELLERS COMMISSIONER